# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ABDULKADIR SHARIF ALI,                )
                                       )
                    Petitioner,        )
                                       )
          v.                           )          1:17CV1034
                                       )
ERIC A. HOOKS,                         )
                                       )
                    Respondent.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Docket Entry 1.) Respondent has moved for summary judgment. (Docket Entries 4, 5.) For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Background

On August 8, 2014, a jury in the Superior Court of Guilford County found Petitioner, along with his co-defendant Ali Mahamed Sheikh, guilty of attempted robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, assault with a deadly weapon inflicting serious injury, and first degree burglary in cases 13 CRS 100094, 100098, 10099, and 14 CRS 24118. (See Docket Entry 1, ¶¶ 1, 2, 4-6; see also Docket Entry 5-6 at 31-38; Docket Entry 5-13 at 815-28.)[1] The trial court sentenced Petitioner and his co-defendant Sheikh to identical sentences of

---

[1] Respondent attached to his brief in support of his instant Motion documents from Petitioner's state criminal proceedings (see Docket Entries 5-2 to 5-13), the authenticity of which Petitioner has not contested (see Docket Entries 6, 8, 9). This Memorandum Opinion cites to those items by the page number in their CM/ECF footers.

(1) 59 to 83 months in prison for their respective, consolidated robbery convictions; (2) 59 to 83 months, served consecutively, for their respective burglary convictions; and (3) 23 to 40 months, served consecutively, for their respective assault convictions. (See Docket Entry 1, ¶ 3; see also Docket Entry 5-6 at 41-46, 51-56; Docket Entry 5-13 at 840-41, 853-54).

Petitioner appealed to the North Carolina Court of Appeals, and retained appellate counsel. (See Docket Entry 1, ¶¶ 8, 9, 16(e); Docket Entry 5-6 at 65-66, 68.) The North Carolina Court of Appeals found no error in Petitioner's convictions and sentences, State v. Sheikh, No. COA-15-688, 786 S.E.2d 433 (table), 2016 WL 1744651, at *2 (May 3, 2016) (unpublished), the North Carolina Supreme Court denied Petitioner's petition for discretionary review ("PDR"), State v. Sheikh, 369 N.C. 39 (2016),[2] and the United States Supreme Court denied Petitioner's petition for a writ of certiorari, Ali v. North Carolina, ___ U.S. ___, 137 S. Ct. 1218 (2017).

Next, Petitioner, still proceeding through appellate counsel, filed a MAR with the trial court. (Docket Entry 5-12.) While Petitioner's MAR remained pending with the trial court, Petitioner, through counsel, instituted this action via his Petition. (Docket Entry 1.) Thereafter, Respondent filed the instant Motion and Supporting Brief. (Docket Entries 4, 5.) Shortly thereafter, the

---

[2] In that same order, the North Carolina Supreme Court additionally allowed Petitioner's Motion to Amend Petition for Discretionary Review. Sheikh, 369 N.C. at 39.

trial court denied Petitioner's MAR.   (Docket Entry 9-1.)[3]
Petitioner subsequently responded in opposition to Respondent's
instant Motion (Docket Entries 6, 8, 9), and Respondent replied
(Docket Entry 10).

## II. Facts

On direct appeal, the North Carolina Court of Appeals
summarized the trial evidence as follows:

> On 19 November 2013, [the victim] traveled to Greensboro,
> North Carolina, on a business trip.  He left his hotel
> room that evening and went to Christie's Cabaret, where
> he had a few drinks and paid for private dances with the
> club's employees.  After spending much of his time with
> one of the club's dancers, Jessica Salinas, he invited
> her to his hotel room after she got off work.  While Ms.
> Salinas was talking with [the victim] at the club, she
> noticed he had a lot of cash with him.
>
> After their conversation ended, Salinas discussed with
> two of her co-workers, Sommer Painter and Heaven
> Shoffner, her intention to rob [the victim] in his hotel
> room after she got off work.  Painter told Salinas she
> knew someone who could rob [the victim] and split the
> money with them.  Painter testified that this person was
> [co-]defendant Sheikh who was her drug dealer.
>
> After the three dancers left work, they went to Painter's
> apartment, where they arrived around 3:15 a.m. or shortly
> thereafter.  Shoffner eventually left with Salinas to
> drive Salinas to [the victim's] hotel room.  [Co-
> d]efendant Sheikh arrived later with [Petitioner], whom
> he introduced to Painter as his cousin.  Painter came up
> with a plan to drive to [the victim's] hotel room, where
> Salinas would let the [co-defendant Sheikh and
> Petitioner] in to commit the robbery.  After about 10 or
> 15 minutes had passed, Shoffner returned to Painter's
> apartment.  Painter and [co-]defendant Sheikh then drove
> in his car to [the victim's] hotel, with [Petitioner]
> following in a different car.  Painter and Salinas were
> communicating through text messages at that time,

_____

[3] On the same day, the trial court also denied Petitioner's "Motion for
Order Designating a Superior Court Judge from Outside Guilford County to Consider
[Petitioner's] [MAR]."   (Docket Entry 10-1 at 4-5.)

planning for the robbery upon [co-defendant Sheikh and Petitioner's] arrival at [the victim's] hotel.

When Salinas first arrived at [the victim's] hotel, she went to a side entrance where she propped a door open to allow [co-defendant Sheikh and Petitioner] to enter. Once inside [the victim's] room, she went to the bathroom to exchange text messages with Painter, letting her know that she was ready to let [co-defendant Sheikh and Petitioner] into the hotel room. When [co-defendant Sheikh and Petitioner] arrived at the hotel, they proceeded to [the victim's] room, and Salinas came out of the bathroom to unlatch the door. The two men, with [co-]defendant Sheikh wearing a clown mask, but [Petitioner] undisguised, then pushed their way into the hotel room. Although the room was dark, [the victim] testified that he could see [co-defendant Sheikh and Petitioner] standing next to the bed where he was laying. [The victim] claimed he heard a gun click, causing him to jump off the bed and tussle with the man with the gun. During the struggle, the man hit [the victim] in the head with the gun, causing the clip of the gun to fall on the floor. [The victim] managed to get away to the hotel lobby where he told the receptionist to call the police — he left a trail of blood from his hotel room. Because [the victim] had hidden most of his cash inside his boot, the two assailants only managed to take a duffel bag containing [the victim's] clothes from the room.

After the robbery, [co-]defendant[] Sheikh and [Petitioner] ran out of the hotel, but [Petitioner] fell and "dropped a bunch of stuff" on his way to the car in which he had arrived. That car sped off as soon as he jumped inside. [Co-d]efendant Sheikh, "covered in blood," got into his car where Painter was waiting. Once inside the car, he told Painter that he had struck [the victim] in the head with his gun, causing the clip to fall out. Salinas meanwhile exited the hotel and hid in some nearby woods until Shoffner picked her up. When Salinas arrived back at Painter's apartment, [co-]defendant Sheikh was there with a bloody mask and a duffel bag containing clothes.

After police investigated the incident, they determined that Salinas was the dancer who had visited [the victim's] hotel room. After arresting and questioning Salinas, she implicated Painter and Shoffner, and the two other women were also eventually arrested. Each dancer was charged with armed robbery, conspiracy to commit armed robbery, burglary, and assault with a deadly weapon inflicting serious injury. During their interrogations, Salinas, Painter, and Shoffner were able to collectively

identify [co-]defendant[] Sheikh and [Petitioner] in photo lineups. As part of the women's plea arrangements, each dancer pled guilty to only conspiracy to commit armed robbery. [Co-d]efendant[] Sheikh and [Petitioner] were also eventually arrested and indicted for assault with a deadly weapon inflicting serious injury [], robbery with a dangerous weapon, first degree burglary, and conspiracy to commit robbery with a dangerous weapon.

Sheikh, 2016 WL 1744651, at *1-2.

## III.  Grounds for Relief

Petitioner presents two grounds for habeas relief.  (See Docket Entry 1, ¶ 12.)  Specifically, he alleges:

1) the trial court "violated Petitioner's right to Due Process by engaging in independent investigation before imposing a sentence, without knowledge of Petitioner" (id., ¶ 12 (GROUND ONE)); and

2) "[t]he [North Carolina] Court of Appeals used the incorrect standard to evaluate Petitioner's contentions set forth in Ground One" (id., ¶ 12 (GROUND TWO)).

## IV. Habeas Standards

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition.  The exhaustion doctrine  .  .  .  is  now  codified  at  28  U.S.C.

-5-

§ 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[4]

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably

---

[4] The Court may deny a claim on the merits despite a lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

applies it to the facts of the particular state prisoner's case."
Id. at 407; see also id. at 409–11 (explaining that "unreasonable"
does not mean merely "incorrect" or "erroneous").

## V.  Discussion

In Ground One, Petitioner contends that the trial court
"violated Petitioner's right to Due Process by engaging in
independent investigation before imposing a sentence, without
knowledge of Petitioner."  (Docket Entry 1, ¶ 12 (GROUND ONE)(a).)[5]
In particular, Petitioner asserts that, under "clearly established
federal constitutional law, decided by the United States Supreme
Court, . . . the self-initiated investigation by the trial judge
into unrelated files entitles [] Petitioner to a new sentencing
hearing, whether or not [the trial judge] *actually* based his
sentencing decision on the information he saw."  (Docket Entry 8 at
2 (citing Tumey v. Ohio, 273 U.S. 510 (1927)).)

Via Ground Two, Petitioner contends that the North Carolina
Court of Appeals unreasonably applied Tumey in denying his parallel
claim on direct appeal by requiring Petitioner to show that the
trial court actually relied on improper information in sentencing
Petitioner.  (See Docket Entry 1, ¶ 12 (GROUND TWO); see also
Docket Entry 8 at 2-4.)  According to Petitioner, the North
Carolina Court of Appeals's subjective standard "entitle[s]
[Petitioner] to subpoena [the trial judge] and ask him on the

--------

[5] As both Ground One and Ground Two assert error arising out of the trial
court's alleged consideration of improper information at sentencing (see Docket
Entry 1, ¶ 12 (GROUND ONE) & (GROUND TWO)), this Recommendation will discuss
those grounds together.

witness stand[] what his sentence decision was based on" (Docket Entry 8 at 3), but "the objective standard of <u>Tumey</u> avoids unnecessary confrontations between lawyers and judges" (<u>id.</u>). Petitioner requests that the Court remand this matter to the North Carolina Court of Appeals to "take a second look at the Due Process issue." (<u>Id.</u> at 4.) Those contentions fall short.

Petitioner bases his grounds for relief on the following discussion between the trial court, Petitioner, and Petitioner's trial counsel:

> T[RIAL] COURT: You indicated that – I looked at the court file this morning, and of course our calendar, and there appeared to be four other sets of charges pending. Are they all being dismissed?
>
> [PETITIONER'S TRIAL COUNSEL]: That's my understanding Your Honor.
>
> . . .
>
> [PETITIONER]: I've never victimized anyone man, never in my life, never victimized anyone, man.
>
> T[RIAL] COURT: Well, let me ask you this. The information during your closing and during the trial is these defendants didn't know each other, but it appears they were arrested on the same day on the same charge, so certainly they knew each other.
>
> [PETITIONER'S TRIAL COUNSEL]: Acquaintances, Your Honor. They're acquaintances.
>
> T[RIAL] COURT: Well, there's also evidence – you've just indicated he is a U.S. citizen, and again I'm just trying to reconcile what I saw in the files – I look at it while I'm waiting for the jury to speak – and it said that he was being investigated by some federal agents. Do you know anything about that?
>
> [PETITIONER]: Confusion with this Ali, confusion with this Ali gentleman, man.
>
> [PETITIONER'S TRIAL COUNSEL]: I don't know anything about that, Your Honor. I've not received any contact either

from [Immigration and Naturalization Services] or someone
else that there's a detainer that is pending or --

[PETITIONER]: That's the gentleman that was just
sentenced, sir, it was not me. I brought documentation
to my lawyer about my naturalization back in 2003. They
keep confusing me with this fellow because of the names.
I've never wanted to victimize anyone, never have
victimized anyone, never will victimize anyone, and those
matters pending, the pending allegations that happened --

T[RIAL] COURT: And it also said that he had multiple fake
IDs, and again, I just want to find out what that was
about. Do you know anything about that . . .?

[PETITIONER'S TRIAL COUNSEL]: No, Your Honor. I don't
think he's charged with identity theft, to my knowledge,
or anything to that effect. I do have a copy of his
naturalization certificate.

T[RIAL] COURT: I just wanted to try to reconcile what I'd
seen in the court file versus what you had indicated to
the jury.

(Docket Entry 5-13 at 847-48.)

Petitioner raised the substance of Ground One on direct appeal

(see Docket Entry 5-7 at 40-42; see also Docket Entry 5-9 at 5-9),

and the North Carolina Court of Appeals rejected his claim as

follows:

[Petitioner] argues that [] the trial court violated his
rights to due process by considering evidence in his
sentencing hearing that disturbed the presumption of
innocence . . . . We do not agree . . . .

While the trial court asked questions about information
he believed he saw in [Petitioner's] court file,
[Petitioner] has failed to show that the trial court
actually based the sentence imposed on [Petitioner] on
any improper factor.

Sheikh, 2016 WL 1744651, at *8 (emphasis added).[6]  Petitioner
raised the substance of Ground Two in his PDR and amended PDR filed
in the North Carolina Supreme Court (see Docket Entry 5-10 at 12-
16, 28-34), which that court summarily denied, Sheikh, 369 N.C. at
39.

Plaintiff's exclusive reliance on the United States Supreme
Court's 1927 decision in Tumey in support of Ground Two ignores
multiple cases the Supreme Court has issued involving claims of
judicial bias in the years since Tumey.  Indeed, contrary to
Petitioner's allegation that the North Carolina Court of Appeals
erred in requiring Petitioner to show that the trial court actually
relied on improper information in sentencing Petitioner (see Docket
Entry 1, ¶ 12 (GROUND TWO); see also Docket Entry 8 at 2-4), the
United States Supreme Court has made clear that only some
situations give rise to a presumption of bias.  See Withrow v.
Larkin, 421 U.S. 35, 47 (1975) ("[V]arious situations have been
identified in which experience teaches that the probability of
actual bias on the part of the judge or decisionmaker is too high
to be constitutionally tolerable.").  More specifically, the
Supreme Court has identified three situations which give rise to s
presumption of bias: "(1) the decision maker has a direct personal,
substantial, and pecuniary interest in the outcome of the case; (2)
an adjudicator has been the target of personal abuse or criticism

_____

[6] Petitioner also raised the substance of Ground One in his MAR (see Docket
Entry 5-12), and the MAR court denied that claim on grounds of procedural default
and, alternatively, on the same grounds as the North Carolina Court of Appeals,
i.e., that Petitioner had "failed to show that the trial court actually based the
sentence imposed on [Petitioner] on any improper factor."  (Docket Entry 10-1 at
2 (emphasis added).)

from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints." Buntion v. Quarterman, 524 F.3d 664, 672 (5th Cir. 2008) (quoting Bigby v. Dretke, 402 F.3d 551, 559 (5th Cir. 2005) (in turn citing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 824-25 (1986), Withrow, 421 U.S. at 47, and In re Murchison, 349 U.S. 133, 139 (1955))). Because Petitioner's contention that the trial court considered improper information during sentencing does not fall within any of those three categories of presumptive bias, the North Carolina Court of Appeals did not contradict or misapply Tumey and its progeny merely by considering whether Petitioner had shown that the trial judge had actually relied on any improper information at sentencing. See Bigby, 402 F.3d at 560 (noting that, because no presumption of bias arose from the defendant's attack on trial judge, the court must "examine the record for indications of actual bias on the part of the trial judge" (emphasis added)).

Likewise, the North Carolina Court of Appeals did not contradict or unreasonably apply Tumey and its progeny in concluding that Petitioner failed to show that the trial court actually relied on any improper factor. Although the trial court asked Petitioner's trial counsel about the disposition of "four other sets of charges pending" (Docket Entry 5-13 at 847), a trial court's consideration during sentencing of pending but unrelated charges against a defendant does not violate due process, see Potter v. Yukins, 6 F. App'x 295, 297 (6th Cir. 2001) (holding that

sentencing "court may properly consider [a] defendant's past conduct in determining punishment, including evidence of crimes for which the defendant has not yet been convicted"); Bourgeois v. Whitley, 784 F.2d 718, 720 (5th Cir. 1986) (ruling that sentencing court may properly consider evidence of crimes for which the defendant has been indicted but not convicted).

Similarly, although the trial court inquired of Petitioner's trial counsel as to whether Petitioner "was being investigated by some federal agents" (Docket Entry 5-12 at 847) and whether he possessed "multiple fake IDs" (id. at 848), in response, Petitioner's trial counsel indicated that he had no knowledge of any detainer, that INS had not contacted him regarding Petitioner, that he possessed a copy of Petitioner's naturalization certificate, and that the state had not charged Petitioner with identity theft (id.). Petitioner also informed the trial court that the information about a federal agent investigation pertained to his co-defendant Sheikh. (Id.) At the conclusion of that discussion, the trial judge stated that he "wanted to try and reconcile what [he had] seen in the court file versus what [Petitioner's trial counsel] had indicated to the jury." (Id.) Those circumstances, including particularly the fact that the trial court allowed Petitioner and his trial counsel to clarify matters, do not demonstrate any impropriety.

The Supreme Court has "acknowledge[d] that what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.'" Aetna Life Ins. Co. v.

Lavoie, 475 U.S. 813, 822 (1986) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).  Thus, "[a]pplication of this vague standard, when viewed through the deferential lens of *Williams v. Taylor* and the [Antiterrorism and Effective Death Penalty Act of 1996], necessarily leaves state courts considerable latitude to pronounce rulings that do not contradict, and are reasonable applications of, *Murchison* and *Tumey*."  Ryan v. Clarke, 387 F.3d 785, 793-94 (8th Cir. 2004).  In this case, Petitioner has fallen far short of establishing that the North Carolina Court of Appeals (or for that matter, the MAR court) contravened or unreasonably applied clearly established authority from the United States Supreme Court.

Accordingly, Petitioner's grounds for relief fail as a matter of law.

## VI. Conclusion

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 4) be granted, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.


                                    /s/ L. Patrick Auld
                                **L. Patrick Auld**
                      **United States Magistrate Judge**


July 13, 2018